Slip Op. 12 - 12

# UNITED STATES COURT OF INTERNATIONAL TRADE

```
                                    :
DIAMOND SAWBLADES                   :
MANUFACTURERS COALITION,            :
                                    :
                  Plaintiff,        :
                                    :
            v.                      :     Before: R. Kenton Musgrave, Senior Judge
                                    :     Court No. 09-00110
UNITED STATES,                      :
                                    :
                  Defendant,        :
                                    :
```

## OPINION AND ORDER

[Granting application to recover attorney's fees and other expenses pursuant to the Equal Access to Justice Act.]

Dated: January 26, 2012

*Wiley, Rein & Fielding LLP* (*Daniel B. Pickard* and *Maureen E. Thorson*), for the plaintiff.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, *Franklin E. White, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (*Delisa M. Sanchez*); and Office of Chief Counsel for Import Administration, U.S. Department of Commerce (*Hardeep K. Josan*), of counsel, for the defendant.

Musgrave, Judge: Diamond Sawblades Manufacturers Coalition ("DSMC") petitions for award of $73,466.11 (current estimate) in fees and expenses against The United States pursuant to 28 U.S.C. § 2412 of the Equal Access to Justice Act ("EAJA"). DSMC succeeded in obtaining a writ of mandamus from the underlying litigation, and the following explains why award is appropriate.

*Background*

The overall unfair trade litigation to which the underlying litigation relates provides context. In 2005, DSMC filed an antidumping petition to obtain relief from imported diamond sawblades from the Republic of Korea and the People's Republic of China. After affirmative preliminary determination before the U.S. Department of Commerce, International Trade Administration ("Commerce" or the "Department") and the U.S. International Trade Commission ("ITC" or "Commission"), the investigation moved into the final determination phase. Commerce reached a final affirmative determination of sales at less than fair value, and at that point issuance of the antidumping duty order depended upon an affirmative final determination of material injury or threat thereof by the Commission. The Commission subsequently made a final determination of no material injury or threat thereof, which effectively put an end to the administrative aspect of the antidumping investigation.

DSMC then brought several separate judicial challenges here. One matter, not relevant here, contests Commerce's margin calculations in the final less-than-fair-value determination concerning respondents from the Republic of Korea. *See* Court No. 06-00248. The other matter, with which DSMC first proceeded, and which is now at an end, challenged the Commission's negative final determination of no material injury or threat thereof. *See* Court No. 06-00247. The challenge resulted in remand to the Commission and ultimately an affirmative determination on the threat of material injury, which remand results were sustained. Slip Op. 09-5, 33 CIT __, 2009 WL 289606 (Jan. 13, 2009).

By letter dated January 22, 2009, ITC notified Commerce that this court had issued a final decision sustaining its affirmative remand determination and that the court's decision was "'not in harmony with' the Commission's original negative injury determination." Pub. Doc. 3 at 1. DSMC commented to Commerce simultaneously, *see* Pub. Doc. 1, arguing that in addition to suspension of liquidation, Commerce should order U.S. Customs and Border Protection to begin immediate collection of cash deposits on the antidumping duties in accordance with *Decca Hospitality Furnishings, LLC v. United States*, 30 CIT 357, 371, 427 F. Supp. 2d 1249, 1262 (2006) ("*Decca*"), *Timken Co. v. United States*, 893 F.2d 337, 341 (Fed. Cir. 1990) ("*Timken*"), and congressional intent "that cash deposit rates be accurate and current" and that "cash deposit rates are important in providing provisional relief to the domestic industry." *Id*. at 3-4 (quoting *Decca*, 30 CIT at 372, 427 F. Supp. 2d at 1263 (citation omitted), and *Tianjin Magnesium Intern. Co. v. United States*, 32 CIT ___, ___, 533 F. Supp. 2d 1327, 1331 n.12 (2008), respectively). DSMC also pointed out that "general principles of administrative [law] require that both judicial and administrative agency decisions, such as CIT's current [final] decision and the Commission's affirmative [threat of] material injury finding, be executed despite pending judicial review" at the appellate level, and that seeking stay of a judgment is the proper procedural avenue to avoid immediate execution on the court's judgment. *Id*. at 4.

Commerce published notice of the court's decision in the Federal Register on February 10, 2009. *Diamond Sawblades and Parts Thereof from the People's Republic of China and the Republic of Korea: Notice of Court Decision Not In Harmony With Final Determination of the Antidumping Duty Investigations*, 74 Fed. Reg. 6570 (Dep't of Comm. Feb. 10, 2009) ("*Timken*

*Notice*").  *See* 19 U.S.C. § 1516a(c)(1); *see also Timken*, 893 F.2d at 341.  Therein, Commerce

announced that liquidation of subject import entries would be suspended within ten days of that

notice and that an antidumping duty order would be issued if the ITC notified it that slip opinion

09-05 "is not appealed or is affirmed on appeal." *Id*.  With respect to DSMC's plea to order

collection of cash deposits, Commerce stated that it would not do so until issuance of a final and

conclusive court decision, and that it "interprets *Timken* to require suspension of liquidation, but not

to direct the Department to require cash deposits on or after the date of the notice."  Pub. Doc. 4 at

4 (Dep't of Comm. memorandum to *Timken Notice*).  Commerce reasoned as follows:

> As the Federal Circuit explained, "an adverse CIT decision merely suspends
> liquidation." *Timken*, 893 F.2d at 342.  The Federal Circuit made this comment
> when explaining its desire to avoid the "'yo-yo' effect" of different treatment of
> entries based upon the latest court decision affecting those entries. Further, the
> Federal Circuit in *Timken* indicated that suspension of liquidation is sufficient "so
> that subsequent entries can be liquidated in accordance with {the} conclusive
> decision." *Id*. We find *Decca* distinguishable on its facts. There, an importer sought
> mandamus for the Department to lower the cash deposit rate from 198.08% to 6.65%
> pending appeals and prior to publication of an amended final determination. *Decca*,
> 427 F. Supp. 2d at 1253-54.  Further, we respectfully disagree that the CIT decided
> *Decca* correctly.  Accordingly, we will not order CBP to collect cash deposits until
> the ITC informs us of a conclusive court decision.

*Id*.

Familiarity with what further transpired is here presumed (including vindication of

*Decca*).  The EAJA petition before the court is solely concerned with the fees and costs associated

with the underlying litigation petitioning for a writ of mandamus requiring Commerce to publish

antidumping duty orders and collect cash deposits on diamond sawblades from the Republic of

Korea and the People's Republic of China.  *See* Slip Op. 09-107, 33 CIT ___, 650 F. Supp. 2d 1331

(2009), *aff'd* 626 F.3d 1374 (Fed. Cir. 2010).

*Argument on the EAJA Petition*

Summarizing, DSMC argues (1) it obviously prevailed in the underlying litigation and its net worth and number of employees meets EAJA's eligibility requirements, (2) the government's position throughout was not substantially justified, (3) no special circumstances make an award unjust, and (4) its fee application is timely and supported by an itemized fee statement. *See* 28 U.S.C. §§ 2412(a)(1), 2412(d)(1); *see also Libas, Ltd. v. United States,* 314 F.3d 1362, 1365 (Fed. Cir. 2003) ("*Libas*"). If that provision of EAJA does not provide relief, DSMC also seeks to hold the United States "liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." 28 U.S.C. §2412(b). *Cf. Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 562 n.6 (1986) (courts have authority to enforce their own orders by assessing attorney's fees against a party that willfully violates a court order).

The government agrees DSMC prevailed, *see* Def.'s Resp. at 21, but it argues DSMC's petition fails to establish that DSMC was the party that authorized and incurred the legal fees in the underlying litigation or establish that DSMC was the direct beneficiary of the underlying litigation for which it seeks EAJA fees. Def.'s Resp. at 6-7. More precisely, the government disputes that DSMC is an eligible "party" as described in EAJA and argues that DSMC is merely a "front" for the "real parties in interest" consisting of those who fund the litigation and to whom beneficial interests in the litigation flow; therefore it "would be appropriate to consider, and perhaps aggregate[,] the assets of the individual members of DSMC for purposes of determining EAJA eligibility[,]" assuming such evidence is present. *Id*. at 18. Apart from party eligibility, the

government also contends Commerce's position was substantially justified.  If not, and the motion

is to be granted, the government argues DSMC's requests for a special enhancement to the statutory

maximum rate and for paralegal fees and for fees for work on the EAJA application should be

denied.

*Discussion*

I.  Whether DSMC Is Eligible For Award Under EAJA

EAJA permits award of attorney's fees and costs to, *inter alia*, an "association . . .

the net worth of which did not exceed $7,000,000 at the time the civil action was filed, and which

had not more than 500 employees at the time the civil action was filed[.]"   28 U.S.C.

2412(d)(2)(B)(ii).  DSMC's petition therefor includes averment that DSMC "is an *ad hoc* trade

association made up of primarily small, family-owned U.S. producers of diamond sawblades" (Pl.'s

Br. at 4); that DSMC was established in 2005 for the purpose of petitioning the government for relief

from unfairly priced imports; that the affiant has served as DSMC's Executive Chairman since 2005;

that DSMC obtained relief in 2009; that DSMC has engaged in "several activities in addition to

petitioning for relief" including involvement in the several appeals related to the above-described

determinations by the Commission and Commerce; that participation in litigation in the federal

courts was not the primary purpose in the formation of DSMC; that DSMC has submitted comments

to the government on trade-related issues, including the need for effective enforcement of the trade

remedy laws; that representatives of DSMC have met with members of Congress regarding trade

remedy law issues; that DSMC has "had numerous contacts with the Bureau of Customs and Border

Protection and with Immigration and Customs Enforcement in matters not directly connected with

the court appeals of decisions made by the Department and the ITC"; and that DSMC has no assets, net worth, or paid employees.  *See* Pl.'s Reply at Ex. 1.

A

EAJA's definition of "association" has been addressed only in passing by the Court of Appeals for the Federal Circuit ("CAFC").  *See Fields v. United States*, 64 F.3d 676 (Fed. Cir. 1995) (unpublished decision describing that in order to recover on EAJA a litigant must prove, *inter alia*, that "*[h]e* is a 'party' as defined in the statute by being . . . an association . . . or organization") (italics added).  Four other federal appellate courts have construed the definition plain either explicitly or implicitly.  *See National Ass'n of Manufacturers v. Dep't of Labor*, 159 F.3d 597, 600 (D.C. Cir. 1998) ("*NAM*") ("plain language of the statute"); *Texas Food Industry Ass'n. v U.S. Dep't of Agriculture*, 81 F.3d 578, 582 (5th Cir. 1996) ("*Texas Food*") ("judicial inquiry into the applicability of § 2414(d)(2)(B) must begin and must end with § 2414(d)(2)(B)'s clear and unambiguous words"); *National Truck Equip. Ass'n v. National Highway Traffic Safety Admin.*, 972 F.2d 669, 674 (6th Cir. 1992) ("*National Truck*") ("obvious meaning" of statute discernible from explicit exceptions to net worth provision); *Love v. Reilly*, 924 F.2d 1492, 1494 (9th Cir. 1991) ("*Love*") (association eligibility determined in accordance with language of statute).

The majority of these decisions also concluded that a trade association meeting EAJA's net worth and employee requirements is eligible for EAJA fees and expenses, regardless of the net worth or employment figures of its members, either individually or jointly.  *See NAM*, 159 F.3d at 600 ("[t]he statute thus places its eligibility ceilings on the association itself"); *Texas Food*, 81 F.3d at 582 ("[t]he statute's purpose . . . is to make associations eligible for an award on the basis

of each association's independent qualifications — not the qualifications of its constituent members"); *Love*, 924 F.2d at 1494 ("[i]n order to prove its eligibility[,] . . . an association . . . must show that its net worth was less than $7,000,000 at the time this suit began and that it had less than 500 employees"). *See also Dalles Irrigation Dist. v. United States*, 91 Fed. Cl. 689, 701 (2010) (adopting majority view and holding "that the language of 28 U.S.C. § 2412(d)(2)(B)(ii) unambiguously contemplates that it is the association alone that must satisfy the standards for eligibility, not also its constituent members as an aggregate group").

The majority thus, along with the CAFC's earlier observation in *Fields*, construes "association" in 28 U.S.C. 2412(d)(2)(B)(ii) according to the term's traditional meaning, as oft-employed in U.S. law. *See, e.g.*, *Hecht v. Malley*, 265 U.S. 144, 157 (1924) ("a term 'used throughout the United States to signify a body of persons united without a charter, but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise'") (citations omitted); *see also*, *e.g.*, *Webster's New International Dictionary of the English Language*, p. 167 (2d ed. 1956). Under U.S. law, an association is legally cognizable as a person with capacity. *See, e.g.*, 1 U.S.C. § 1; *see also*, *e.g.*, *Kearney v. Taylor*, 56 U.S. 494 (1853).

This court follows suit and concludes DSMC's petition papers provide *prima facie* that DSMC fits the description of an EAJA-eligible association. *Cf. Allegheny Bradford Corp. v. United States*, 28 CIT 2107 n.2, 350 F. Supp. 2d 1332 n.2 (2004) (finding applicant satisfied EAJA eligibility based on affidavit of applicant's vice president).

B

The government nonetheless urges a "real party in interest" inquiry[1] into who funded the underlying litigation in order to determine "whether DSMC is no more than a 'front' or a 'sham' through which ineligible entities pursued litigation." Def.'s Resp. at 13 (quoting *NAM*, 159 F.3d at 603). The argument puts the cart before the horse.

The real party in interest is the person who actually possesses the substantive right being asserted and has a legal right to enforce the claim. *See, e.g.*, *Childress v. Emory*, 21 U.S. 642 (1823). In order to "pierce the associational veil" and trigger such an inquiry, the government must first point to evidence in the record that would reasonably lead to the conclusion that DSMC is in fact a sham and not a legitimate trade association. *See NAM*, 159 F.3d at 603 ("*if* an association were no more than a "front" or a "sham" through which ineligible entities pursued litigation and recovered fees, it *would be* appropriate to pierce the associational veil and look to the real parties in interest") (italics added). The fact that an association might consist of a "mix" of eligible and ineligible membership is insufficient, *see id*. at 603-04, the government must specifically point to evidence showing control over DSMC by an EAJA-ineligible entity. This the government has not done.

The government requested and was granted the opportunity to submit a sur-reply in the event DSMC should "attempt to supplement or 'clarify' its EAJA application in its reply brief

---

[1] In an earlier decision considering the government's real-party-in-interest opposition*, Unification Church v. Immigration & Naturalization Service*, 762 F.2d 1077 (D.C. Cir. 1985), upheld denial of a fee award that would have inured to an EAJA-ineligible *association* through its members' EAJA application because the members had been promised by the church association that it would pay their legal fees regardless of the outcome. *See* 762 F.2d at 1082, 1091-92. The government repeatedly raises the doctrine in arguing that EAJA awards would inure to EAJA-ineligible *members* of associations. *See, e.g.*, *Love*, 924 F.2d at 1494; *NAM*, 159 F.3d at 599-*passim*.

with facts and/or legal arguments not included in its application and memorandum in support thereof." Def.'s Resp. at 37.  As in its response brief, the government's sur-reply implicitly relies on *NAM* and continues to assume that DSMC is required to prove that it is an "independent" entity operated independently of its constituent members by an independent board and independent executive control, *et cetera*.  *See* Def.'s Sur-Reply . . . Pursuant to [EAJA] ("Def.'s Sur-Reply") at 5-6; *see also* Def.'s Resp. at 10-11 (pointing to discussion in *NAM* concerning the record evidence that the NAM association is an independent *corporation* managed by its own officers and executives and retaining complete responsibility and authority to direct the actions of its counsel throughout the litigation).[2]  Based on such assumption, the government's sur-reply consists of innuendo, speculation, and straw man argumentation attempting to impugn DSMC's legitimacy.

        The attempt fails.  The point of that discussion in *NAM* was simply to disprove by way of the evidentiary record "the government's veiled accusation that [EAJA-ineligible] members of NAM *controlled* this litigation and that NAM merely acted as their puppet[.]" *See NAM*, 159 F.3d at 604 (italics added).  Cutting to the chase, in *NAM* the appellate panel simply held that the association plaintiff "plainly was not established for the purposes of conducting this law suit." *Id*. (citation omitted).  Here, similarly, although the matter at bar does not present the level of

---

        [2] *See NAM*, 159 F.3d at 604.  Noting that the organization was founded in 1895, the *NAM* panel described NAM as "an independent corporation, independently managed by its own officers and executives" and that based on the affidavit of its senior vice president declaring that the association "and not its individual members or affiliates . . . retained complete responsibility and authority to direct the actions of its counsel throughout this litigation" and further observed that the district court "made a specific evidentiary finding that NAM's individual corporate members 'played no part in the legal prosecution or decision-making processes of this case[.]'" *Id*. (quoting *National Ass'n of Mfrs. v. U.S. Dept. of Labor*, 962 F. Supp. 191, 194 (D.D.C. 1997)).

evidentiary detail described in *NAM*, DSMC, was clearly not organized for the purposes of generating EAJA fees or for conducting *this* law suit for mandamus.

Obviously DSMC had the capacity to bring suit. It participated in administrative proceedings and subsequent litigation in order to seek unfair trade relief, and it was, in effect, forced to pursue the underlying mandamus litigation in order to deter apparent injustice at the hands of the sovereign. The government offers nothing to bolster its allegation that DSMC is a sham, or its assumption that the burden was on DSMC to demonstrate "independence"[3] in order to "avoid" a real party in interest inquiry, the government apparently having chosen not to engage in further discovery. *Cf. NAM*, 159 F.3d at 605 n.8 ("DOL never sought to discover evidence of such overlap" and "[i]n

---

[3]   *Cf.*, *e.g.*, Def's Sur-Reply at 5-6 (claiming that the declaration of DSMC's executive director "fails to demonstrate that DSMC is an independent association managed by its own officers and executives, that it directed the actions of its counsel throughout the underlying litigation in this case, or that DSMC is the 'real party in interest' with respect to the EAJA fees sought in this matter" and that the declaration "sheds no light whatsoever upon the structure of DSMC, its relationship with its counsel or its members, or how the association is managed" and that the declaration "does not even state that DSMC incurred any of the legal fees and expenses sought by its counsel in the motion for award of attorney's fees and expenses" and that "[s]urely [DSMC's executive director] . . . would have knowledge of any legal fees and expenses incurred by DSMC if DSMC had in fact incurred those expenses" and that it is "telling that [he] . . . failed to declare that DSMC itself incurred the expenses that are the subject of the EAJA petition" and that "although DSMC presented to the Court five exhibits for the first time with its reply brief, to date it has not submitted any evidence to establish that it had a fee agreement with its counsel making it responsible for the expenses of the litigation" and that "if DSMC were the real party in interest with respect to the motion for fees pursuant to the EAJA, DSMC would have submitted evidence to that effect with its motion and initial brief[,]" *et cetera*). The government further argues that DSMC "concedes" in its reply brief that DSMC did not incur the fees and expenses it seeks in this matter because DSMC stated as follows: "With regard to the payment of its legal fees, Wiley Rein LLP tracks time spent on DSMC under a DSMC-specific billing number. *See* DSMC Application at Exhibit 1. Individual member companies each pay a specified percentage of the monthly bill, however, the client is the DSMC." *Id.* at 7, quoting DSMC Reply at 6. From this statement, the government contends DSMC's counsel "directly" bills DSMC's individual member companies certain "specified percentages of monthly bills[.]" *Id.* The assumption is unwarranted from the statement presented.

the face of NAM's declaration to the contrary, . . . there was no reason for the district court to

presume an overlap existed").   The fact that DSMC has no assets, net worth or employees is

insufficient to impugn its legitimacy.   *See*, *e.g. Project Basic Tenants Union v. Rhode Island*

*Housing and Mortg. Finance Corp*., 636 F. Supp. 1453 (D.R.I. 1986).   And although it is true, as

the government implies, that the declaration of DSMC's "Executive Chairman" does not illuminate

whether he is not also involved with an EAJA-ineligible member, assuming *arguendo* that is relevant

to this instance, the burden on that question lies with the government.   *Cf. NAM*, 159 F.3d at 604-05

(expressing doubt that NAM bore the "additional" burden, beyond the language of the statute, of

proving that its members are not the real parties in interest, referencing therefor *Love*, 924 F.2d at

1494, and holding that "the government never sought discovery that would have carried the day for

it on that question").   Even if he is, his "control" of DSMC's actions would not impugn DSMC's

legitimacy as an association in the absence of indicia to the effect that its purpose was for, or

subverted to, the exclusive benefit of an EAJA-ineligible member, the latter again being matters for

the government to pursue and not DSMC to prove.   *Cf. id*. at 605 n.8 (*see supra*) *with United States*

*v. Bestfoods*, 524 U.S. 51, 61 (1998) ("courts generally presume that the directors are wearing their

'subsidiary hats' and not their 'parent hats' when acting for the subsidiary") (citations omitted).

          The substantive right over these matters, not only in the initiation of the petition but

also in the underlying mandamus litigation (which is a subset of the plaintiff's broader trade

litigation), has nominally been held by DSMC, a trade association consisting of, and acting on behalf

of, association members.   The record of DSMC's litigation indicates DSMC was formed because no

single domestic industry producer or manufacturer accounted for most of the production of domestic

like product in its own right to support a petition to initiate the investigation into unfair trade

practices. *See* Inves. Nos. 731-TA-1092-1093 (Preliminary): Diamond Sawblades from China and

Korea   Staff Report, Confidential Document No. 117 (USITC July 5, 2005) at Table III-1. *Cf.* 19

U.S.C. 1671a(c)(4)(A) & 1673a(c)(4)(A) (determination of whether petition is filed "on behalf of"

means petition has support from at least those producers or workers accounting for 25 percent of

total production of domestic like product and more than 50 percent of the production of the domestic

like product produced by that portion of the industry expressing support for the petition); 19 U.S.C.

§ 1677(4)(A) ("industry" means "the producers as a whole of a domestic like product, or those

producers whose collective output of a domestic like product constitutes a major proportion of the

total domestic production of the product"). In other words, U.S. unfair trade law effectively *required*

an association of members of the domestic diamond sawblades industry in order to show sufficient

support for the antidumping petition to trigger the investigation. An individual member of DSMC

may have had standing to challenge aspects of ITC's final negative determination to the extent it was

an "interested party who was a party to the proceeding[,]" *see* 19 U.S.C. 1516a(a)(1), but none have

done so.[4]

> DSMC's reply brief and its attachments address the evidentiary formality concerns

raised in the government's response brief. Counsel for DSMC avers that it "tracks time spent on

DSMC matters under a DSMC-specific billing number. . . . [and i]ndividual member companies each

---

[4] Thus the so-called "free-rider" problem identified in *State of Louisiana, ex. rel. Guste v. Lee*, 853 F.2d 1219, 1225 (5th Cir.1988), where an EAJA-eligible party joins an EAJA-ineligible party in litigation that the EAJA-ineligible party was "fully willing and able to prosecute . . . against the United States[,]" is simply not present in this case. In any event, the "free rider" problem has been limited to suits for EAJA fees consisting of a "mix" of EAJA-eligible and EAJA-ineligible co-plaintiffs. *See Texas Food*, 81 F.3d at 582 n.7.

pay a specified percentage of the monthly bill, however, the client is the DSMC."  Pl.'s Reply at 6.

DSMC offers to submit evidence of "each company's net worth and employee information" if they

be deemed necessary, *see* Pl.'s Reply at 4 n.2, but the court considers DSMC's proffer unnecessary

as the government has not produced evidence to rebut DSMC's *prima facie* case to warrant a real-

party-in-interest inquiry.

        In the absence of indicia that DSMC is being controlled or subverted by an EAJA-

ineligible member, the fact that each member contributes to the cost of litigation of their association

is alone not sufficient to justify "piercing the associational veil" via a real-party-in-interest inquiry

into DSMC's individual members' net worth and numbers of employees.  *Cf. Unification Church*,

762 F.2d at 1079, 1083, 1091-92 (district court record clearly showed that only an EAJA-ineligible

church association, and not any of the other three plaintiff members of that association, would have

benefitted from award of EAJA); *Love*, 924 F.2d at 1494 (fact that members received benefits of

litigation does not make them "real parties in interest").[5]

---

    [5]  *But see Love*, 924 F.2d at 1494 ("members of the NWFPA would be the real party in
interest in the fee litigation only if they were liable for the NWFPA's attorney's fees"); *NAM*, 159
F.3d at 604 ("payment of membership dues does not render a member liable for the costs of a
litigation" and "mebership dues clearly have not financed this litigation").  However, a *per se*
prohibition against member financing of association litigation would effectively render "association"
in EAJA superfluous.  An association always acts "on behalf of" if not "for" its members. Unless
it has access to outside sources of income (*e.g.*, as would be the case of a for-profit association, in
which case it is technically a partnership), association operations are dependant, as necessary, upon
membership financing.  In other words, "member funding of litigation" is a tautology, and its
members can always be deemed "real parties in interest," behind any association litigation, in a
general sense.

C

In passing, the court also notes the government's other contention that "it would be appropriate to consider, and perhaps aggregate the assets of the individual members of DSMC for purposes of determining EAJA eligibility" in accordance with *National Truck*. *See* Def.'s Resp. at 17-18.  The court disagrees for a variety of reasons.  These may be quickly summarized as follows: (1) although *National Truck* held the meaning of "association" plain, the decision construed the term to mean an "aggregation," which is contrary to its traditional treatment in U.S. law as a single person (*see supra*); (2) according to *NAM*, the government expressly disavowed reliance upon that decision (*see NAM*, 159 F.3d at 602); (3) aggregation eviscerates "association" from the statute by requiring consideration of every individual member's eligibility (individuals are EAJA-eligible if their net worth does not exceed $2 million at the time the civil action is filed) (*see id*.); (4) such an inquiry is unwieldy; (5) nothing in the statute suggests that one member's ineligibility should disqualify an entire association's eligibility or convert the association-eligibility inquiry into one of individual-eligibility for each member (*see id*. at 603; *Texas Food*, 81 F.3d at 581; *Love*, 924 F.2d at 1494); and (6) Model Rule 0.104(g) announced at the 1981 Administrative Conference of the United States (*see Equal Access to Justice Act: Agency Implementation*, 46 Fed. Reg. 32900, 32912 (1981); *see also National Truck*, 972 F.2d at 672) similarly emasculates the traditional and obvious meaning of "association" from EAJA, because an association, typically acting in its representational capacity, will literally never be found not to have "participate[d] in a proceeding primarily on behalf of one or more other persons or entities" for which an award of EAJA may be sought.  Nonetheless, should DSMC wish to submit evidence of the net worth and employees of its individual members for the

record, it will be accepted in addition to the matters ordered *infra*.  Any costs involved in the

preparation and submission of such shall be borne by DSMC, unless contested by the government.

D

To sum up, DSMC has provided support for finding that it is a legitimate and EAJA-

eligible association.  To date, it has pursued a matter of interest to all its members as well as the

domestic industry as a whole, namely remediation of unfair trade practices.  Such remediation is

also in the interest of public policy.  The benefits DSMC's members derived thereby, and from the

underlying litigation, did not and do not flow individually, but collectively, through their concerted

action through DSMC, including their bearing of DSMC's costs.  The government's position, apart

from innuendo, *et cetera*, does not persuasively impugn DSMC's proof of its legitimacy.  Therefore,

based on the papers and other indicia from the overall unfair trade litigation, the court finds that

DSMC is not a mere "sham" but is in fact a legitimate trade association meeting EAJA's net worth

and employee requirements as well as EAJA's purpose on the basis of DSMC's current presentation.

*See* Pl.'s Reply at Ex. 1.

II.  Whether Commerce was "Substantially Justified"

Having found DSMC an eligible party for purposes of EAJA, the court also finds the

government's position not "substantially justified."   *See* 28 U.S.C. § 2412(d)(1)(A).

The government has the burden of proving its position was substantially justified.

*E.g. Libas*, 314 F.3d at 1366; *Jazz Photo Corp. v. United States*, 31 CIT 1101, 1107, 502 F. Supp.

2d 1277, 1284 (2007).  The test is whether the government's pre-litigation conduct as well as the

litigation itself (as to which "only one threshold determination for the entire civil action is to be

made"; *see Comm'r, Immigration & Naturalization Servs. v. Jean*, 496 U.S. 154, 159 (1990)), was

"justified in substance or in the main[,]" *i.e.*, "justified to a degree that could satisfy a reasonable

person." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).   This amounts to a discretionary

"judgment call" thereon, *Chiu v. United States*, 948 F.2d 711, 715 (Fed. Cir. 1991), and is distinct

from the merits themselves.  *See*, *e.g.*, *Cooper v. United States Railroad Retirement Bd.*, 24 F.3d

1414, 1416 (D.C. Cir. 1994) ("substantial justification" for purposes of EAJA may not be collapsed

into the merits of the underlying litigation).  No presumption arises from the fact that the government

lost on the merits.  *See* H.R. Rep. 96-1418, 96th Cong., 2d Sess. 5-6, *reprinted in* 1980 U.S.C.C.A.N.

4984, 4989-4990.

On this EAJA matter, the government argues its position in the underlying litigation

was substantially justified by "long established practice" of issuing antidumping duty orders and

ordering the collection of cash deposits only when there is "a final and conclusive court opinion."

Def.'s Resp. at 7.  Its full justification may be distilled to the following:

> For many years prior to this Court's grant of DSMC's petition for a writ of
> mandamus in this case, Commerce had an established practice of action it took upon
> a final (but not conclusive) court decision that was "not in harmony" with an agency
> determination.  Based upon the guidance issued by the court of appeals in *Timken Co.
> v. United States*, 893 F.2d 337, 341 (Fed. Cir. 1990) and *Hosiden Corp. v. United
> States*, 85 F.3d 589 (Fed. Cir. 1996), Commerce's practice was to publish a notice
> of that final court decision in the Federal Register (known as the *Timken Notice*) and
> merely suspend (or continue to suspend) liquidation of the subject entries.  All other
> actions necessary to implement the final court decision (such as changing the cash
> deposit rate or revoking/issuing the order) would only be taken once there was a
> "final and conclusive" court decision (*i.e.*, after the appeal process had run its
> course).  Notably, Commerce's practice was not challenged for approximately 20
> years until the merits litigation for which DSMC now seeks fees under the EAJA.
>                                          * * *
> In this case, Commerce was substantially justified in defending its practice
> because, based upon the facts and circumstances of this case, Commerce believed

that it was not required, or permitted, to issue antidumping duty orders and order the collection of cash deposits in the absence of a final and conclusive decision affirming the ITC's affirmative injury determination**. . . .**

                                              * * *

        In this case, the . . . Government was not alone in its interpretation of the statute or the legal authority at issue in the underlying litigation; the ITC and five other parties advanced the same arguments advanced by the Government in defending DSMC's application for a writ of mandamus. . . .

        . . . . At the time that Commerce issued the Timken Notice, no court had issued a decision criticizing the Government's practice. In *Bowey v. West*, 218 F.3d 1373, 1377 (Fed. Cir. 2000), the court of appeals held that its "holding in [*Owen v. United States*, 861 F.2d 1273, 1275 (Fed. Cir. 1988) (en banc)] stands for the proposition that substantial justification is measured, not against the case law existing at the time the EAJA motion is decided, but rather, against the case law that was prevailing at the time the government adopted its position." . . .

        Here, Commerce acted in the same manner that it had acted for over twenty years with respect to the issuance of antidumping duty orders and collection of cash deposits during the pendency of an appeal. DSMC was not singled-out for disparate treatment and the fact that the Court rejected the Government's defense of a twenty year practice does not establish that the Government's position lacked a reasonable basis. Thus, the Court should deny DSMC's application for fees upon the EAJA.

Def's Reply at 21-25.

        Considering the foregoing, the court finds that the government has not proven that its position in the underlying litigation was substantially justified. This conclusion does not derive from Commerce's persistence in an unreasonable interpretation of the unfair trade statutes, case law, and its obligations thereunder, but is due to the obvious or pernicious and continuous injury that such persistence effected upon the domestic industry to which Commerce owes a clear duty to properly administer the law in order "[t]o protect domestic industries from unfair competition by imported products," *e.g. Federal-Mogul Corp. v. United States*, 63 F.3d 1572, 1575 (Fed. Cir. 1995) that also persisted until such time as Commerce acted in accordance with this court's writ. This was not simply a case of justice delayed, it was injury perpetuated. In persisting in an unreasonable

interpretation of law, Commerce failed to implement the relief to which DSMC was entitled, exacerbated an identifiable and continuing injury to DSMC, and compounded the waste of resources up through the appellate process.

In an unpublished decision, *Shinyei Corp. of America v. United States*, No. 2010-1178, 2010 WL 4146384 (Fed. Cir. 2010), the CAFC panel reduced "the government's litigation position . . . to the following: we erred when we inadvertently left Shinyei off the orders to liquidate at the reduced rate and then after being notified of this error by the filing of this lawsuit, we nonetheless ordered the liquidation of the entries at the incorrect much higher rate, and this liquidation deprives the court of jurisdiction over this case." *See* 2010 WL 4146384 at *3. The court then held such a position not substantially justified and the failure to recognize that at the trial level an abuse of discretion. *Id*. at *4.

In this matter, Commerce had ample notice in advance of the ITC's affirmative remand determination that should have led it, at the very least, to reconsider its interpretation of the unfair trade laws, however longstanding, with respect to its own obligations and those owed DSMC. There was the plain language of the statutes themselves, as the CAFC held, and the "common sense" apparent therein that suspension of liquidation would have done nothing to preserve the relief to which DSMC was immediately entitled by virtue of prevailing on the merits of its action against ITC's original negative final determination that resulted in the ITC's affirmative remand determination and which relief would be lost on an ongoing basis in the absence of an antidumping duty order and collection of cash deposits. *See generally* 626 F.3d at 1379-82.

There was also no "guidance" in *Timken* that led to the reading of it that the government insisted upon.  *See id*. at 1381.  There was, however, among the case law the obvious instance of *Decca*, *supra*, (about which the government's explanation, above, omits any reference), which, in granting mandamus, specifically noted that an agency's "remand determination, as a matter of law, replaces [the agency's] original, final determination."  *Decca*, 30 CIT at 363 n.11, 427 F. Supp. 2d at 1256 n.11.  Commerce did not appeal that decision, nor, apparently, consider its implications, but instead chose to persist in an unreasonable interpretation of statutory obligations under U.S. trade law, as well as in an unreasonably contorted interpretation of *Timken*.

There was also this court's own intimation in slip opinion 09-5, *supra*, as to the correct course of action Commerce should take.  In sustaining the ITC's affirmative remand determination, the court specifically considered DSMC's request for judicial orders requiring "(1) the Commission to notify Commerce of the sustained remand results and to publish them in the Federal Register, (2) Commerce to publish notice of the sustained remand results and "order the suspension of liquidation and collection of cash deposits."  *See* Slip Op. 09-5 at 25-26, 2009 WL 289606 at *15.  DSMC contended that this additional action was necessary because they are required by law and "the agencies have, in other cases, delayed such actions until all appeals are exhausted." *Id*.  This court interpreted the requests in the nature of a petition for a writ of mandamus and concluded the following:

> The court is unable to find that a writ of mandamus is appropriate *at this time.* The plaintiff's request is *based upon speculation that the ITC and Department of Commerce may, in the future, fail to perform duties required by law*. However, *at the present time, the standard operation of the law* provides to the plaintiff an adequate means to attain the desired relief.  Accordingly, the plaintiff's request must be denied.

*Id*. (italics added).

Finally, there was Commerce's own independent duty to preserve the *status quo* and the legally operative effect of this court's decisions thereon, as it subsequently acknowledged (to some extent) in *Diamond Sawblades Mfrs. Coalition v. United States*, 33 CIT ___, ___, 650 F. Supp. 2d 1331, 1356 (2009). Therein, Commerce argued that suspension of liquidation preserves the *status quo* on the case, *id*. at 1338, but it should have been inarguable that suspension of liquidation in no way provides the relief to which DSMC was immediately entitled by virtue of the ITC's affirmative threat-of-material-injury determination on remand, because the relief provided thereby is *prospective only* as to entry and which would necessarily be foregone, and injury continued, in the absence of publication of the antidumping duty order and the beginning of cash deposit collection.

Having the reputation of "master" of the unfair trade laws, *e.g.*, *Consumer Products Div., SCM Corp. v. Silver Reed America, Inc.*, 753 F.2d 1033, 1039 (Fed. Cir.1985), Commerce should have been clear as to its administrative obligations at the time of issuance of the ITC's affirmative remand determination. This was likewise confirmed at the appellate level, wherein the CAFC described the government's argument on its position as "frivolous" and "fatuous." 626 F.3d at 1379. The executive branch, including Commerce, may not, consistent with its constitutional obligations, reduce federal judicial review to the status of mere "advisory opinion" with which it is free to agree or disagree at whim. *See, e.g.*, *Allegheny Bradford Corporation v. United States*, 28 CIT 2107, 2112, 350 F. Supp. 2d 1332, 1337 (2004) (granting attorney's fees under the EAJA and observing "[o]n several prior occasions, this Court has rejected arguments that its orders require less than full compliance"); *D&M Watch Corp v. United States*, 16 CIT 285, 296, 795 F. Supp. 1160,

1169 (1992) (attempted evasion of effect of Court's judgment by executive agency "tends to diminish the dignity of and respect for judicial review and the resultant process").

The court therefore finds that Commerce's position was not substantially justified. Accordingly, the court need not reach DSMC's alternative ground for an award of fees and costs.

### III.   "Special Circumstances"

EAJA requires consideration of whether there are "special circumstances" that would make an award unjust.   *See* 28 U.S.C. § 2412(d)(1)(A).   Generally speaking, the special circumstances provision prevents recovery when the petitioning party has engaged in bad faith behavior and equitable considerations ("unclean hands") indicate an award would be unjust.   *See*, *e.g.*, *Lokos v. Equal Employment Opportunity Comm'n*, 940 F.2d 676 (1991); *Devine v. Sutermeister*, 733 F.2d 892, 895-96 (Fed. Cir. 1984).   No such circumstances are present in this instance as would preclude a fee award to DSMC.

### IV.   "Itemized Statement"

EAJA requires that the party seeking an award of attorney fees and expenses submit, among other things, "an itemized statement . . . stating the actual time expended and the rate at which fees and other expenses are computed."   29 U.S.C. § 2412(d)(1)(B) (1982).   *Naporano Iron and Metal Co. v. United States*, 825 F.2d 403, 404-05 (Fed. Cir. 1987) observes from this that the prevailing party (1) must provide the Court with information detailing the "exact time spent on the case, by whom, their status and usual billing rates, as well as a breakdown of expenses[,]" and (2) the court or government should not be "forced" to parse invoices to determine which attorney's and paralegal's time and/or expenses are included in an EAJA request or to separate recoverable from

non-recoverable costs.  DSMC's itemization addresses those requirements by detailing the dates,

personnel, hours spent, and the legal matters on which time was expended.  *See* Pl.'s Br. at Ex. 1.

        The government's expresses concern that DSMC's exhibit does not contain copies

of the "actual invoices or bills from DSMC" and therefore the government does "not know to what

entity or individual was billed by counsel for DSMC[.]"  Def.'s Resp. at 29.  In reply, counsel for

DSMC avers that "DSMC did not submit the actual invoices it was issued by its attorneys because

those invoices contained billing entries for work unrelated to the underlying litigation[.]"  Pl.'s Reply

at 6, 9.  The government did not request further proof nor further address the issue in its sur-reply,

if it remained unsatisfied.  The court therefore finds the reply of counsel for DSMC satisfactory.

Further, based on the averment of counsel for DSMC that it "tracks time spent on DSMC matters

under a DSMC-specific billing number" and that "the client is the DSMC[,]" Pl.'s Reply at 6, the

court finds the form of DSMC's itemization of attorney's fees and costs sufficient for purposes of

EAJA.

        Perusing each attorney fee item and the docket of the underlying mandamus litigation,

the court finds that each item relates to the underlying mandamus litigation, and that the total amount

of attorney's fees requested represents 167 hours of attorney work on the underlying litigation.  *See*

Pl.'s Br. at Ex. 1.  The government apparently "does not challenge as unreasonable the . . . hours for

which DSMC seeks attorney fees,"[6] and it also agrees that in the event DSMC merits an EAJA

award, DSMC is also entitled to research, copying and telephone costs in the amount of $391.16.

*See* Pl.'s Br. at Ex. 3.  The court therefore finds the total attorney hours spent plus the itemized cost

_____

        [6]  The total number of hours is apparently misprinted in the defendant's brief; without further
indication of disagreement, it is concluded a clerical mistake.  *Cf.*  Def.'s Resp. at 29, 31.

amounts related to the underlying litigation reasonable and that DSMC is entitled to compensation

for them.

## V.  Fee Award Enhancement Above Statutory Rate

EAJA permits recovery of "fees and other expenses" including reasonable attorney's

fees not "in excess of $125 per hour unless the court determines that an increase in the cost of living

*or a special factor, such as* the limited availability of qualified attorneys for the proceedings

involved, justifies a higher fee."  28 U.S.C. § 2412(d)(2)(A) (italics added).

DSMC requests that it be awarded attorney's fees above the statutory rate, *i.e.*, in total

$62,127.50.  It argues it is entitled to enhancement due to "the distinctive knowledge of antidumping

law that was required for the litigation and the limited availability of qualified attorneys for the

proceedings involved[,]" Pl.'s Br. at 14, that "[s]pecialized knowledge and experience in

antidumping law was essential to the successful litigation of these issues[,]" and that "[p]laintiffs'

attorneys possess the requisite knowledge and litigation experience in the field of antidumping law."

*Id*. at 15-16.   The government disagrees that international trade representation in this matter

amounted to a "specialized" skill permitting enhancement.

In *Pierce*, *supra*, the Supreme Court clarified that "limited availability of qualified

attorneys for the proceedings involved" in the exemplar "refers to attorneys having some distinctive

knowledge or specialized skill *needful for the litigation in question*   as opposed to an extraordinary

level of the general lawyerly knowledge and ability useful in all litigation." *Pierce*, 487 U.S. at 572

(italics added).  Further clarifying that attorneys should be awarded fees above the statutory cap only

if they are " 'qualified for the proceedings' in some specialized sense, rather than just in their general

legal competence[,]" it provided as examples "patent law, or knowledge of foreign law or language." *Id*. Further, "the other 'special factors' envisioned by the exception must be such as are not of broad and general application" such as the "novelty and difficulty of issues," "the undesirability of the case," the "work and ability of counsel," and "the results obtained." *Id*.

Here, DSMC succeeded in the judicial process that resulted in administrative reversal on remand of the original negative injury determination, albeit only with respect to threat of material injury.   When those results were sustained, DSMC's requested judicial orders covering the obligations of Commerce that would have been triggered by those results.   At the time, the request was denied without prejudice as premature.  *See supra*.   Commerce subsequently refused to issue an antidumping duty order and begin the collection of cash deposits, which forced DSMC to file the underlying litigation seeking mandamus, on which DSMC prevailed, and on which this EAJA petition is solely concerned.

The "litigation in question" thus concerned obtaining a writ of mandamus.   Seeking mandamus as a general matter is a process well within that which would be considered "the general lawyerly knowledge and ability useful in all litigation."  However, obtaining the writ in *this* instance required the "distinctive knowledge or specialized skill" of an international trade law attorney in order to successfully prevail.  *See Libas, Ltd. v. United States*, 27 CIT 1193, 1197, 283 F. Supp. 2d 1327, 1332 (2003) (attorney must demonstrate specialized skills were applied in the litigation).  As the CAFC remarked, "[t]his case presents a highly technical issue of statutory construction that is of some significance to the administration of the antidumping laws."  626 F.3d at 1378.

Members of the international trade bar are expected to (and do) have a solid understanding of the interrelationship of U.S. and customs laws and administration as applied to international trade. "The court considers customs law to be a specialized practice area, distinct from general and administrative law, for purposes of EAJA." *Jazz Photo Corp. v. United States*, 32 CIT ___, ___, 597 F. Supp. 2d 1364, 1369 (2008) (referencing *Nakamura v. Heinrich*, 17 CIT 119, 121 (1993)). *See also Libas*, 27 CIT at 1197-98, 283 F. Supp. 2d at 1332-33. This court likewise considers international trade practice a "specialized practice" area requiring interdisciplinary knowledge and skill beyond the "extraordinary level of the general lawyerly knowledge and ability useful in all litigation." *See Pierce*, 487 U.S. at 572. The practice regularly calls upon skills acquired from such diverse fields as economics, accounting, business operations, finance, customs, taxation, technical standards, foreign laws, regulations and administrative practices, linguistics and foreign languages, "political astuteness," *et cetera*. DSMC's fee award will therefore be enhanced.

## VI. Paralegal Fees

DSMC's itemization for the mandamus litigation also lists a total of 24.5 hours for paralegal assistance at rates ranging from $120 to $170. "[A] prevailing party that satisfies EAJA's other requirements may recover its paralegal fees from the Government at prevailing market rates." *Richlin Sec. Service Co. v. Chertoff*, 553 U.S. 571, 590 (2008). *See* 28 U.S.C. § 2412(d)(2)(A). DSMC's counsel provides as evidence of the prevailing market rates for paralegal services the affidavit of its Chief Human Resources Officer ("CHRO"). Pl.'s Reply at Ex. 4. This person declares that she has served in that capacity since 1986, that counsel charges at or below prevailing market rates for services provided by its paralegals, including project assistants and legal assistants,

that counsel conducts market studies annually to identify the prevailing market rates for paralegal

services in the Washington, D.C. metropolitan area at law firms that are reasonably comparable to

counsel's firm in terms of skill, experience and reputation, that counsel then sets its rates for

paralegal services according to the prevailing market rates, and that in 2009, fees of $120 to $170

per hour for services performed by paralegals fell within the range of prevailing market rates in that

metropolitan area.  *See id*.

      The government, however, argues that "EAJA caselaw and other recent decisions

indicate . . . the rates for paralegals are generally at, and often below, $100 per hour." Def.'s Resp.

at 35 (referencing *McKay v. Barnhart*, 327 F. Supp. 2d 263, 270 (S.D.N.Y. 2004)).  That may be true

in nearby social security decisions where "the prevailing rate for paralegal services in the Southern

District of New York is $75 per hour" has been repeated therein since at least 1997 (*see*, *e.g.*, *Wilder*

*v.Bernstein*, 975 F. Supp. 276, 282 (S.D.N.Y. 1997)), but in Washington D.C. in 2009, the tale is

different.  Although the government belittles the utility of CHRO's affidavit as *ipse dixit*, Def's Sur-

Reply at 9, the CAFC, at least, appears to have acknowledged the utility of the adjusted Laffey

Matrix[7] in the determination of legal and paralegal fees for the Washington D.C. metropolitan area.

*See Rodriguez v. Sec'y of Health and Human Services*, 632 F.3d 1381 (Fed. Cir. 2011); *see also*, *e.g.*,

*Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995).  The court therefore takes

judicial notice of the price of paralegal services in that matrix, which range from $152 to $161 for

the period June 1, 2008 to May 31, 2011, and finds that DSMC's range of $120 to $170 reasonable

---

      [7]   *See Covington v. District of Columbia*, 57 F.3d 1101, 1105-11 (D.C. Cir. 1995) (citing
*Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), *rev'd on other grounds* 746 F.2d
4 (D.C. Cir. 1984)).  The adjusted matrix is available at http://www.laffeymatrix.com/see.html (last
examined this date).

by comparison, but only up to $161.  DSMC may therefore recover paralegal fees as itemized but only up to a rate of $161 for any items invoiced at $170 per hour.

## VII.  Consultant Fee

DSMC's itemization also lists a $105 in fees from a consultant.  The item pertaining to this work describes only "read DSB CAFC decision" but it is also juxtaposed on the same date as and against DSMC's counsel's review and analysis of the CAFC decision affirming the CIT's issuance of the mandamus writ.  The government has not commented further concerning the item, and it will therefore be allowed.

## VIII.  EAJA Petition Preparation Fees

At present, DSMC also seeks $6,318.11 and $4,630.00 (estimated) in attorney's fees for 35.25 and 18.25 hours worth of attorney work on its EAJA petition and reply brief respectively.  *See* Pl's Br. at Ex. 2; Pl.'s Reply at Ex. 5.  Such fees are permissible in principle under EAJA, *see*, *e.g.*, *Fritz v. Principi*, 264 F.3d 1372, 1377 (Fed. Cir. 2001); *Keely v. Merit Systems Protection Bd.*, 793 F.2d 1273, 1275 (Fed. Cir. 1986).  The government argues the request is premature, Def.'s Resp. at 29, but DSMC having been found entitled to an award under EAJA, the issue is ripe and the award will be permitted such fees.

Attorney's fees are not entitled to a special factor enhancement for the time spent in preparation of the EAJA petition.  *See*, *e.g.*, *Ragan v. Comm'r of Internal Revenue*, 210 F.3d 514, 518-19 (5th Cir. 2000) (citing *Powers v. Comm'r of Internal Revenue*, 43 F.3d 172, 179-80 (5th Cir. 1995)).  DSMC therefore requests a cost of living ("COLA") adjustment for such fees, which are specifically permitted to account for inflation.  *See* 28 U.S.C. § 2412(d)(2)(A).  The Court of Claims,

brother tribunal within the ambit of the Federal Circuit with substantial experience considering

COLA adjustments in EAJA contexts, has observed that in order "[t]o receive a COLA, the plaintiff

does not need to do any 'more than request such an adjustment and present a basis upon which the

adjustment should be calculated.'" *Greenhill v. United States*, 96 Fed. Cl. 771, 783 (2011) (quoting

*California Marine Cleaning, Inc. v. United States*, 43 Fed. Cl. 724, 733 (1999)).  This court will

follow suit.

        To shorten this discussion, a COLA adjustment for an item of attorney's fees involves

taking the statute's current baseline of $125 per hour, multiplying that rate by the appropriate

inflation index number[8] corresponding to the "endpoint" month in which services were rendered

(using a mid-point calculation for a closer approximation as necessary), and then dividing that figure

by 155.70, which is the baseline[9] CPI-U index number for March 1996 when Congress amended

EAJA's hourly attorney's fee rate from $75 (*see* Pub.L. 104-121, Title II, § 232, 110 Stat. 863).  *See*,

*e.g.*, *Chiu*, *supra*, 948 F.2d at 722 n.10.  In order to avoid the *Shaw* interest problem resulting from

delayed payment of fees,[10] it is necessary to apply the appropriate COLA to each fee bill, or payment

thereof when paid.  *Cf.*, *e.g.*, *id*. at 720.  DSMC shall submit proof of the dates of either of these (at

---

[8]  Indice numbers reflect the increase in inflation as of the last day of the month.  The consumer price index for all urban consumers ("CPI U") maintained by the U.S. Department of Labor, Bureau of Labor Statistics is reliable for routine COLA adjustments.  *See*, *e.g.*, *Jazz Photo*, *supra*, 32 CIT at ___, 597 F. Supp. 2d at 1371 & n.4.

[9]  The effective date of the statutory cap is the baseline date.  *See Doty v. United States*, 71 F.3d 384, 387 (Fed. Cir. 1995).

[10]  Interest may not be awarded pursuant to EAJA.  *See Library of Congress v. Shaw*, 478 U.S. 310 (1986), *superseded on other grounds by* Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071.  *Cf. Chiu*, 948 F.2d at 722 n.10 ("court must exclude inflation occurring after all services have been performed" to determine COLA adjustment)

its option) plus COLA calculations applied thereto, or it may submit COLA calculations applied to each attorney's fee item.  For example, for the attorney hours incurred on February 13, 2009, the mid-point CPI-U for that date is approximately 211.668, so $125.00 x 211.668 / 155.70    $169.93 per hour for mid-February 2009 attorney fees.

## IX.  Additional Fees

DSMC also requests reimbursement of fees incurred in the preparation of its response to the defendant's September 14, 2011 motion to strike or in the alternative to file a sur-reply.  The request is hereby denied.  DSMC's reply brief on its petition presented additional factual material, and therefore the defendant had a legitimate reason for moving to submit its sur-reply, which motion would have been obviated had the material been presented in DSMC's petition in the first place, even if it may be concluded that provision of the material was not improper support for rebuttal of aspects of the government's responsive argumentation.

## *Conclusion*

In view of the foregoing, DSMC's motion for attorney's fees and expenses under the EAJA is granted, and the court need not reach DSMC's alternative grounds for relief.  DSMC may have 30 days to submit a final itemization of fees for the preparation and briefing of its EAJA petition in accordance with the foregoing, including COLA calculation(s), and a total of the EAJA fees and expenses incurred.  Any questions thereon may be directed to the Clerk of the Court.

**So ordered**.

                                                      /s/  R. Kenton Musgrave
                                                    R.  Kenton Musgrave, Senior Judge

Dated: January 26, 2012
         New York, New York